(Slip Opinion)          OCTOBER  TERM,  2009          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* STEVENS

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 08–769.   Argued October 6, 2009—Decided April 20, 2010

Congress enacted 18 U. S. C. §48 to criminalize the commercial crea-
tion, sale, or possession of certain depictions of animal cruelty.  The
statute addresses only *portrayals* of harmful acts, not the underlying
conduct.  It applies to any visual or auditory depiction "in which a liv-
ing animal is intentionally maimed, mutilated, tortured, wounded, or
killed," if that conduct violates federal or state law where "the crea-
tion, sale, or possession takes place," §48(c)(1).  Another clause ex-
empts depictions with "serious religious, political, scientific, educa-
tional, journalistic, historical, or artistic value."  §48(b).  The
legislative background of §48 focused primarily on "crush videos,"
which feature the torture and killing of helpless animals and are said
to appeal to persons with a specific sexual fetish.  Respondent Ste-
vens was indicted under §48 for selling videos depicting dogfighting.
He moved to dismiss, arguing that §48 is facially invalid under the
First Amendment.  The District Court denied his motion, and Ste-
vens was convicted.  The Third Circuit vacated the conviction and de-
clared §48 facially unconstitutional as a content-based regulation of
protected speech.

*Held:* Section §48 is substantially overbroad, and therefore invalid un-
der the First Amendment.  Pp. 5–20.

   (a) Depictions of animal cruelty are not, as a class, categorically
unprotected by the First Amendment.  Because §48 explicitly regu-
lates expression based on content, it is " 'presumptively invalid,' . . .
and the Government bears the burden to rebut that presumption."
*United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803,
817.  Since its enactment, the First Amendment has permitted re-
strictions on a few historic categories of speech—including obscenity,
defamation, fraud, incitement, and speech integral to criminal con-

duct—that "have never been thought to raise any Constitutional problem," *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 572. Depictions of animal cruelty should not be added to that list. While the prohibition of animal cruelty has a long history in American law, there is no evidence of a similar tradition prohibiting *depictions* of such cruelty. The Government's proposed test would broadly balance the value of the speech against its societal costs to determine whether the First Amendment even applies. But the First Amendment's free speech guarantee does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. *New York* v. *Ferber*, 458 U. S. 747, distinguished. Pp. 5–9.

 (b) Stevens's facial challenge succeeds under existing doctrine. Pp. 9–20.

  (1) In the First Amendment context, a law may be invalidated as overbroad if "a 'substantial number' of its applications are unconstitutional, '"judged in relation to the statute's plainly legitimate sweep."'" *Washington State Grange* v. *Washington State Republican Party*, 552 U. S. 442, 449, n. 6. Stevens claims that common depictions of ordinary and lawful activities constitute the vast majority of materials subject to §48. The Government does not defend such applications, but contends that the statute is narrowly limited to specific types of extreme material. Section 48's constitutionality thus turns on how broadly it is construed. Pp. 9–10.

  (2) Section 48 creates a criminal prohibition of alarming breadth. The statute's definition of a "depiction of animal cruelty" does not even require that the depicted conduct be cruel. While the words "maimed, mutilated, [and] tortured" convey cruelty, "wounded" and "killed" do not. Those words have little ambiguity and should be read according to their ordinary meaning. Section 48 does require that the depicted conduct be "illegal," but many federal and state laws concerning the proper treatment of animals are not designed to guard against animal cruelty. For example, endangered species protections restrict even the humane wounding or killing of animals. The statute draws no distinction based on the reason the conduct is made illegal.

  Moreover, §48 applies to any depiction of conduct that is illegal in the State in which the depiction is created, sold, or possessed, "regardless of whether the . . . wounding . . . or killing took place" there, §48(c)(1). Depictions of entirely lawful conduct may run afoul of the ban if those depictions later find their way into States where the same conduct is unlawful. This greatly expands §48's scope, because views about animal cruelty and regulations having no connection to

cruelty vary widely from place to place. Hunting is unlawful in the District of Columbia, for example, but there is an enormous national market for hunting-related depictions, greatly exceeding the demand for crush videos or animal fighting depictions. Because the statute allows each jurisdiction to export its laws to the rest of the country, §48(a) applies to any magazine or video depicting lawful hunting that is sold in the Nation's Capital. Those seeking to comply with the law face a bewildering maze of regulations from at least 56 separate jurisdictions. Pp. 11–15.

(3) Limiting §48's reach to crush videos and depictions of animal fighting or other extreme cruelty, as the Government suggests, requires an unrealistically broad reading of the statute's exceptions clause. The statute only exempts material with "serious" value, and "serious" must be taken seriously. The excepted speech must also fall within one of §48(b)'s enumerated categories. Much speech does not. For example, most hunting depictions are not obviously instructional in nature. The exceptions clause simply has no adequate reading that results in the statute's banning only the depictions the Government would like to ban.

Although the language of §48(b) is drawn from the Court's decision in *Miller* v. *California*, 413 U. S. 15, the exceptions clause does not answer every First Amendment objection. Under *Miller*, "serious" value shields depictions of sex from regulation as obscenity. But *Miller* did not determine that serious value could be used as a general precondition to protecting *other* types of speech in the first place. Even "'wholly neutral futilities . . . come under the protection of free speech.'" *Cohen* v. *California*, 403 U. S. 15, 25. The First Amendment presumptively extends to many forms of speech that do not qualify for §48(b)'s serious-value exception, but nonetheless fall within §48(c)'s broad reach. Pp. 15–17.

(4) Despite the Government's assurance that it will apply §48 to reach only "extreme" cruelty, this Court will not uphold an unconstitutional statute merely because the Government promises to use it responsibly. Nor can the Court construe this statutory language to avoid constitutional doubt. A limiting construction can be imposed only if the statute "is 'readily susceptible' to such a construction," *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 884. To read §48 as the Government desires requires rewriting, not just reinterpretation. Pp. 18–19.

(5) This construction of §48 decides the constitutional question. The Government makes no effort to defend §48 as applied beyond crush videos and depictions of animal fighting. It argues that those particular depictions are intrinsically related to criminal conduct or are analogous to obscenity (if not themselves obscene), and that the

Syllabus

ban on such speech would satisfy the proper level of scrutiny. But the Government nowhere extends these arguments to other depictions, such as hunting magazines and videos, that are presumptively protected by the First Amendment but that remain subject to §48. Nor does the Government seriously contest that these presumptively impermissible applications of §48 far outnumber any permissible ones. The Court therefore does not decide whether a statute limited to crush videos or other depictions of extreme animal cruelty would be constitutional. Section 48 is not so limited but is instead substantially overbroad, and therefore invalid under the First Amendment. Pp. 19–20.

533 F. 3d 218, affirmed.

ROBERTS, C. J., delivered the opinion of the Court, in which STEVENS, SCALIA, KENNEDY, THOMAS, GINSBURG, BREYER, and SOTOMAYOR, JJ., joined. ALITO, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–769

_____

## UNITED STATES, PETITIONER *v.* ROBERT J. STEVENS

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

[April 20, 2010]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Congress enacted 18 U. S. C. §48 to criminalize the commercial creation, sale, or possession of certain depictions of animal cruelty. The statute does not address underlying acts harmful to animals, but only portrayals of such conduct. The question presented is whether the prohibition in the statute is consistent with the freedom of speech guaranteed by the First Amendment.

## I

Section 48 establishes a criminal penalty of up to five years in prison for anyone who knowingly "creates, sells, or possesses a depiction of animal cruelty," if done "for commercial gain" in interstate or foreign commerce. §48(a).[1] A depiction of "animal cruelty" is defined as one

_____

[1] The statute reads in full:

"§48. Depiction of animal cruelty

"(a) CREATION, SALE, OR POSSESSION.—Whoever knowingly creates, sells, or possesses a depiction of animal cruelty with the intention of placing that depiction in interstate or foreign commerce for commercial gain, shall be fined under this title or imprisoned not more than 5

"in which a living animal is intentionally maimed, muti-
lated, tortured, wounded, or killed," if that conduct vio-
lates federal or state law where "the creation, sale, or
possession takes place." §48(c)(1). In what is referred to
as the "exceptions clause," the law exempts from prohibi-
tion any depiction "that has serious religious, political,
scientific, educational, journalistic, historical, or artistic
value." §48(b).

The legislative background of §48 focused primarily on
the interstate market for "crush videos." According to the
House Committee Report on the bill, such videos feature
the intentional torture and killing of helpless animals,
including cats, dogs, monkeys, mice, and hamsters. H. R.
Rep. No. 106–397, p. 2 (1999) (hereinafter H. R. Rep.).
Crush videos often depict women slowly crushing animals
to death "with their bare feet or while wearing high heeled
shoes," sometimes while "talking to the animals in a kind
of dominatrix patter" over "[t]he cries and squeals of the
animals, obviously in great pain." *Ibid.* Apparently these
depictions "appeal to persons with a very specific sexual

_____

years, or both.

  "(b) EXCEPTION.—Subsection (a) does not apply to any depiction
that has serious religious, political, scientific, educational, journalistic,
historical, or artistic value.

  "(c) DEFINITIONS.—In this section—

  "(1) the term 'depiction of animal cruelty' means any visual or
auditory depiction, including any photograph, motion-picture film,
video recording, electronic image, or sound recording of conduct in
which a living animal is intentionally maimed, mutilated, tortured,
wounded, or killed, if such conduct is illegal under Federal law or the
law of the State in which the creation, sale, or possession takes place,
regardless of whether the maiming, mutilation, torture, wounding, or
killing took place in the State; and

  "(2) the term 'State' means each of the several States, the Dis-
trict of Columbia, the Commonwealth of Puerto Rico, the Virgin Is-
lands, Guam, American Samoa, the Commonwealth of the Northern
Mariana Islands, and any other commonwealth, territory, or possession
of the United States."

fetish who find them sexually arousing or otherwise excit-
ing." *Id.,* at 2–3. The acts depicted in crush videos are
typically prohibited by the animal cruelty laws enacted by
all 50 States and the District of Columbia. See Brief for
United States 25, n. 7 (listing statutes). But crush videos
rarely disclose the participants' identities, inhibiting
prosecution of the underlying conduct. See H. R. Rep., at
3; accord, Brief for State of Florida et al. as *Amici Curiae*
11.

This case, however, involves an application of §48 to
depictions of animal fighting. Dogfighting, for example, is
unlawful in all 50 States and the District of Columbia, see
Brief for United States 26, n. 8 (listing statutes), and has
been restricted by federal law since 1976. Animal Welfare
Act Amendments of 1976, §17, 90 Stat. 421, 7 U. S. C.
§2156. Respondent Robert J. Stevens ran a business,
"Dogs of Velvet and Steel," and an associated Web site,
through which he sold videos of pit bulls engaging in
dogfights and attacking other animals. Among these
videos were Japan Pit Fights and Pick-A-Winna: A Pit
Bull Documentary, which include contemporary footage of
dogfights in Japan (where such conduct is allegedly legal)
as well as footage of American dogfights from the 1960's
and 1970's.[2] A third video, Catch Dogs and Country Liv-
ing, depicts the use of pit bulls to hunt wild boar, as well
as a "gruesome" scene of a pit bull attacking a domestic
farm pig. 533 F. 3d 218, 221 (CA3 2008) (en banc). On the
basis of these videos, Stevens was indicted on three counts
of violating §48.

Stevens moved to dismiss the indictment, arguing that
§48 is facially invalid under the First Amendment. The

---

[2] The Government contends that these dogfights were unlawful at the
time they occurred, while Stevens disputes the assertion. Reply Brief
for United States 25, n. 14 (hereinafter Reply Brief); Brief for Respon-
dent 44, n. 18.

District Court denied the motion. It held that the depictions subject to §48, like obscenity or child pornography, are categorically unprotected by the First Amendment. 2:04–cr–00051–ANB (WD Pa., Nov. 10, 2004), App. to Pet. for Cert. 65a–71a. It went on to hold that §48 is not substantially overbroad, because the exceptions clause sufficiently narrows the statute to constitutional applications. *Id.,* at 71a–75a. The jury convicted Stevens on all counts, and the District Court sentenced him to three concurrent sentences of 37 months' imprisonment, followed by three years of supervised release. App. 37.

The en banc Third Circuit, over a three-judge dissent, declared §48 facially unconstitutional and vacated Stevens's conviction. 533 F. 3d 218. The Court of Appeals first held that §48 regulates speech that is protected by the First Amendment. The Court declined to recognize a new category of unprotected speech for depictions of animal cruelty, *id.,* at 224, and n. 6, and rejected the Government's analogy between animal cruelty depictions and child pornography, *id.,* at 224–232.

The Court of Appeals then held that §48 could not survive strict scrutiny as a content-based regulation of protected speech. *Id.,* at 232. It found that the statute lacked a compelling government interest and was neither narrowly tailored to preventing animal cruelty nor the least restrictive means of doing so. *Id.,* at 232–235. It therefore held §48 facially invalid.

In an extended footnote, the Third Circuit noted that §48 "might also be unconstitutionally overbroad," because it "potentially covers a great deal of constitutionally protected speech" and "sweeps [too] widely" to be limited only by prosecutorial discretion. *Id.,* at 235, n. 16. But the Court of Appeals declined to rest its analysis on this ground.

We granted certiorari. 556 U. S. ___ (2009).

## II

The Government's primary submission is that §48 necessarily complies with the Constitution because the banned depictions of animal cruelty, as a class, are categorically unprotected by the First Amendment. We disagree.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft* v. *American Civil Liberties Union*, 535 U. S. 564, 573 (2002) (internal quotation marks omitted). Section 48 explicitly regulates expression based on content: The statute restricts "visual [and] auditory depiction[s]," such as photographs, videos, or sound recordings, depending on whether they depict conduct in which a living animal is intentionally harmed. As such, §48 is "'presumptively invalid,' and the Government bears the burden to rebut that presumption." *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 817 (2000) (quoting *R. A. V.* v. *St. Paul*, 505 U. S. 377, 382 (1992); citation omitted).

"From 1791 to the present," however, the First Amendment has "permitted restrictions upon the content of speech in a few limited areas," and has never "include[d] a freedom to disregard these traditional limitations." *Id.,* at 382–383. These "historic and traditional categories long familiar to the bar," *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 127 (1991) (KENNEDY, J., concurring in judgment)—including obscenity, *Roth* v. *United States*, 354 U. S. 476, 483 (1957), defamation, *Beauharnais* v. *Illinois*, 343 U. S. 250, 254–255 (1952), fraud, *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 771 (1976), incitement, *Brandenburg* v. *Ohio*, 395 U. S. 444, 447–449

(1969) (*per curiam*), and speech integral to criminal conduct, *Giboney* v. *Empire Storage & Ice Co.*, 336 U. S. 490, 498 (1949)—are "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 571–572 (1942).

The Government argues that "depictions of animal cruelty" should be added to the list. It contends that depictions of "illegal acts of animal cruelty" that are "made, sold, or possessed for commercial gain" necessarily "lack expressive value," and may accordingly "be regulated as *unprotected* speech." Brief for United States 10 (emphasis added). The claim is not just that Congress may regulate depictions of animal cruelty subject to the First Amendment, but that these depictions are outside the reach of that Amendment altogether—that they fall into a "'First Amendment Free Zone.'" *Board of Airport Comm'rs of Los Angeles* v. *Jews for Jesus, Inc.*, 482 U. S. 569, 574 (1987).

As the Government notes, the prohibition of animal cruelty itself has a long history in American law, starting with the early settlement of the Colonies. Reply Brief 12, n. 8; see, *e.g.,* The Body of Liberties §92 (Mass. Bay Colony 1641), reprinted in American Historical Documents 1000–1904, 43 Harvard Classics 66, 79 (C. Eliot ed. 1910) ("No man shall exercise any Tirranny or Crueltie towards any bruite Creature which are usuallie kept for man's use"). But we are unaware of any similar tradition excluding *depictions* of animal cruelty from "the freedom of speech" codified in the First Amendment, and the Government points us to none.

The Government contends that "historical evidence" about the reach of the First Amendment is not "a necessary prerequisite for regulation today," Reply Brief 12, n. 8, and that categories of speech may be exempted from

the First Amendment's protection without any long-settled tradition of subjecting that speech to regulation. Instead, the Government points to Congress's "'legislative judgment that . . . depictions of animals being intentionally tortured and killed [are] of such minimal redeeming value as to render [them] unworthy of First Amendment protection,'" Brief for United States 23 (quoting 533 F. 3d, at 243 (Cowen, J., dissenting)), and asks the Court to uphold the ban on the same basis. The Government thus proposes that a claim of categorical exclusion should be considered under a simple balancing test: "Whether a given category of speech enjoys First Amendment protection depends upon a categorical balancing of the value of the speech against its societal costs." Brief for United States 8; see also *id.,* at 12.

As a free-floating test for First Amendment coverage, that sentence is startling and dangerous. The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it. The Constitution is not a document "prescribing limits, and declaring that those limits may be passed at pleasure." *Marbury* v. *Madison*, 1 Cranch 137, 178 (1803).

To be fair to the Government, its view did not emerge from a vacuum. As the Government correctly notes, this Court has often *described* historically unprotected categories of speech as being "'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" *R. A. V., supra*, at 383 (quoting *Chaplinsky, supra*, at 572). In *New York* v. *Ferber*, 458 U. S.

747 (1982), we noted that within these categories of unprotected speech, "the evil to be restricted so overwhelmingly outweighs the expressive interests, if any, at stake, that no process of case-by-case adjudication is required," because "the balance of competing interests is clearly struck," *id.,* at 763–764. The Government derives its proposed test from these descriptions in our precedents. See Brief for United States 12–13.

But such descriptions are just that—descriptive. They do not set forth a test that may be applied as a general matter to permit the Government to imprison any speaker so long as his speech is deemed valueless or unnecessary, or so long as an ad hoc calculus of costs and benefits tilts in a statute's favor.

When we have identified categories of speech as fully outside the protection of the First Amendment, it has not been on the basis of a simple cost-benefit analysis. In *Ferber,* for example, we classified child pornography as such a category, 458 U. S., at 763. We noted that the State of New York had a compelling interest in protecting children from abuse, and that the value of using children in these works (as opposed to simulated conduct or adult actors) was *de minimis. Id.,* at 756–757, 762. But our decision did not rest on this "balance of competing interests" alone. *Id.*, at 764. We made clear that *Ferber* presented a special case: The market for child pornography was "intrinsically related" to the underlying abuse, and was therefore "an integral part of the production of such materials, an activity illegal throughout the Nation." *Id.,* at 759, 761. As we noted, "'[i]t rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.'" *Id.,* at 761–762 (quoting *Giboney, supra*, at 498). *Ferber* thus grounded its analysis in a previously recognized, long-established category of unprotected speech,

and our subsequent decisions have shared this under-standing. See *Osborne* v. *Ohio*, 495 U. S. 103, 110 (1990) (describing *Ferber* as finding "persuasive" the argument that the advertising and sale of child pornography was "an integral part" of its unlawful production (internal quota-tion marks omitted)); *Ashcroft* v. *Free Speech Coalition*, 535 U. S. 234, 249–250 (2002) (noting that distribution and sale "were intrinsically related to the sexual abuse of children," giving the speech at issue "a proximate link to the crime from which it came" (internal quotation marks omitted)).

Our decisions in *Ferber* and other cases cannot be taken as establishing a freewheeling authority to declare new categories of speech outside the scope of the First Amend-ment. Maybe there are some categories of speech that have been historically unprotected, but have not yet been specifically identified or discussed as such in our case law. But if so, there is no evidence that "depictions of animal cruelty" is among them. We need not foreclose the future recognition of such additional categories to reject the Government's highly manipulable balancing test as a means of identifying them.

## III

Because we decline to carve out from the First Amend-ment any novel exception for §48, we review Stevens's First Amendment challenge under our existing doctrine.

## A

Stevens challenged §48 on its face, arguing that any conviction secured under the statute would be unconstitu-tional. The court below decided the case on that basis, 533 F. 3d, at 231, n. 13, and we granted the Solicitor General's petition for certiorari to determine "whether 18 U. S. C. 48 is facially invalid under the Free Speech Clause of the First Amendment," Pet. for Cert. i.

To succeed in a typical facial attack, Stevens would have to establish "that no set of circumstances exists under which [§48] would be valid," *United States* v. *Salerno*, 481 U. S. 739, 745 (1987), or that the statute lacks any "plainly legitimate sweep," *Washington* v. *Glucksberg*, 521 U. S. 702, 740, n. 7 (1997) (STEVENS, J., concurring in judgments) (internal quotation marks omitted). Which standard applies in a typical case is a matter of dispute that we need not and do not address, and neither *Salerno* nor *Glucksberg* is a speech case. Here the Government asserts that Stevens cannot prevail because §48 is plainly legitimate as applied to crush videos and animal fighting depictions. Deciding this case through a traditional facial analysis would require us to resolve whether these applications of §48 are in fact consistent with the Constitution.

In the First Amendment context, however, this Court recognizes "a second type of facial challenge," whereby a law may be invalidated as overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Washington State Grange* v. *Washington State Republican Party*, 552 U. S. 442, 449, n. 6 (2008) (internal quotation marks omitted). Stevens argues that §48 applies to common depictions of ordinary and lawful activities, and that these depictions constitute the vast majority of materials subject to the statute. Brief for Respondent 22–25. The Government makes no effort to defend such a broad ban as constitutional. Instead, the Government's entire defense of §48 rests on interpreting the statute as narrowly limited to specific types of "extreme" material. Brief for United States 8. As the parties have presented the issue, therefore, the constitutionality of §48 hinges on how broadly it is construed. It is to that question that we now turn.[3]

––––––––––

[3] The dissent contends that because there has not been a ruling on

## B

As we explained two Terms ago, "[t]he first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States* v. *Williams*, 553 U. S. 285, 293 (2008). Because §48 is a federal statute, there is no need to defer to a state court's authority to interpret its own law.

We read §48 to create a criminal prohibition of alarming breadth. To begin with, the text of the statute's ban on a "depiction of animal cruelty" nowhere requires that the depicted conduct be cruel. That text applies to "any . . . depiction" in which "a living animal is intentionally maimed, mutilated, tortured, wounded, or killed." §48(c)(1). "[M]aimed, mutilated, [and] tortured" convey cruelty, but "wounded" or "killed" do not suggest any such limitation.

The Government contends that the terms in the definition should be read to require the additional element of "accompanying acts of cruelty." Reply Brief 6; see also Tr. of Oral Arg. 17–19. (The dissent hinges on the same

---

the validity of the statute as applied to Stevens, our consideration of his facial overbreadth claim is premature. *Post,* at 1, and n. 1, 2–3 (opinion of ALITO, J.). Whether or not that conclusion follows, here no as-applied claim has been preserved. Neither court below construed Stevens's briefs as adequately developing a separate attack on a defined subset of the statute's applications (say, dogfighting videos). See 533 F. 3d 218, 231, n. 13 (CA3 2008) (en banc) ("Stevens brings a facial challenge to the statute"); App. to Pet. for Cert. 65a, 74a. Neither did the Government, see Brief for United States in No. 05–2497 (CA3), p. 28 (opposing "the appellant's facial challenge"); accord, Brief for United States 4. The sentence in Stevens's appellate brief mentioning his unrelated sufficiency-of-the-evidence challenge hardly developed a First Amendment as-applied claim. See *post,* at 1, n. 1. Stevens's constitutional argument is a general one. And unlike the challengers in *Washington State Grange*, Stevens does not "rest on factual assumptions . . . that can be evaluated only in the context of an as-applied challenge." 552 U. S., at 444.

assumption.  See *post,* at 6, 9.)  The Government bases
this argument on the definiendum, "depiction of animal
cruelty," cf. *Leocal* v. *Ashcroft*, 543 U. S. 1, 11 (2004), and
on "'the commonsense canon of *noscitur a sociis*.'"  Reply
Brief 7 (quoting *Williams*, 553 U. S., at 294).  As that
canon recognizes, an ambiguous term may be "given more
precise content by the neighboring words with which it is
associated."  *Ibid*.  Likewise, an unclear definitional
phrase may take meaning from the term to be defined, see
*Leocal*, *supra,* at 11 (interpreting a "'substantial risk'" of
the "us[e]" of "physical force" as part of the definition of
"'crime of violence'").

But the phrase "wounded . . . or killed" at issue here
contains little ambiguity.  The Government's opening brief
properly applies the ordinary meaning of these words,
stating for example that to "'kill' is 'to deprive of life.'"
Brief for United States 14 (quoting Webster's Third New
International Dictionary 1242 (1993)).  We agree that
"wounded" and "killed" should be read according to their
ordinary meaning.  Cf. *Engine Mfrs. Assn.* v. *South Coast
Air Quality Management Dist.*, 541 U. S. 246, 252 (2004).
Nothing about that meaning requires cruelty.

While not requiring cruelty, §48 does require that the
depicted conduct be "illegal."  But this requirement does
not limit §48 along the lines the Government suggests.
There are myriad federal and state laws concerning the
proper treatment of animals, but many of them are not
designed to guard against animal cruelty.  Protections of
endangered species, for example, restrict even the humane
"wound[ing] or kill[ing]" of "living animal[s]."  §48(c)(1).
Livestock regulations are often designed to protect the
health of human beings, and hunting and fishing rules
(seasons, licensure, bag limits, weight requirements) can
be designed to raise revenue, preserve animal populations,
or prevent accidents.  The text of §48(c) draws no distinc-
tion based on the reason the intentional killing of an

animal is made illegal, and includes, for example, the humane slaughter of a stolen cow.[4]

What is more, the application of §48 to depictions of illegal conduct extends to conduct that is illegal in only a single jurisdiction. Under subsection (c)(1), the depicted conduct need only be illegal in "the State in which the creation, sale, or possession takes place, regardless of whether the . . . wounding . . . or killing took place in [that] State." A depiction of entirely lawful conduct runs afoul of the ban if that depiction later finds its way into another State where the same conduct is unlawful. This provision greatly expands the scope of §48, because although there may be "a broad societal consensus" against cruelty to animals, Brief for United States 2, there is substantial disagreement on what types of conduct are properly regarded as cruel. Both views about cruelty to animals and regulations having no connection to cruelty vary widely from place to place.

In the District of Columbia, for example, all hunting is unlawful. D. C. Munic. Regs., tit. 19, §1560 (2009). Other jurisdictions permit or encourage hunting, and there is an enormous national market for hunting-related depictions in which a living animal is intentionally killed. Hunting periodicals have circulations in the hundreds of thousands or millions, see Mediaweek, Sept. 29, 2008, p. 28, and hunting television programs, videos, and Web sites are equally popular, see Brief for Professional Outdoor Media

―――――――

[4] The citations in the dissent's appendix are beside the point. The cited statutes stand for the proposition that hunting is not covered by animal cruelty laws. But the reach of §48 is, as we have explained, not restricted to depictions of conduct that violates a law specifically directed at animal cruelty. It simply requires that the depicted conduct be "illegal." §48(c)(1). The Government implicitly admits as much, arguing that "instructional videos for hunting" are saved by the statute's exceptions clause, not that they fall outside the prohibition in the first place. Reply Brief 6.

Association et al. as *Amici Curiae* 9–10.  The demand for
hunting depictions exceeds the estimated demand for
crush videos or animal fighting depictions by several
orders of magnitude.  Compare *ibid.* and Brief for National
Rifle Association of America, Inc., as *Amicus Curiae* 12
(hereinafter NRA Brief) (estimating that hunting maga-
zines alone account for $135 million in annual retail sales)
with Brief for United States 43–44, 46 (suggesting $1
million in crush video sales per year, and noting that
Stevens earned $57,000 from his videos).  Nonetheless,
because the statute allows each jurisdiction to export its
laws to the rest of the country, §48(a) extends to *any*
magazine or video depicting lawful hunting, so long as
that depiction is sold within the Nation's Capital.

   Those seeking to comply with the law thus face a bewil-
dering maze of regulations from at least 56 separate juris-
dictions.  Some States permit hunting with crossbows, Ga.
Code Ann. §27–3–4(1) (2007); Va. Code Ann. §29.1–
519(A)(6) (Lexis 2008 Cum. Supp.), while others forbid it,
Ore. Admin. Reg. 635–065–0725 (2009), or restrict it only
to the disabled, N. Y. Envir. Conserv. Law Ann. §11–
0901(16) (West 2005).  Missouri allows the "canned" hunt-
ing of ungulates held in captivity, Mo. Code Regs. Ann.,
tit. 3, 10–9.560(1), but Montana restricts such hunting to
certain bird species, Mont. Admin. Rule 12.6.1202(1)
(2007).  The sharp-tailed grouse may be hunted in Idaho,
but not in Washington.  Compare Idaho Admin. Code
§13.01.09.606 (2009) with Wash. Admin. Code §232–28–
342 (2009).

   The disagreements among the States—and the "com-
monwealth[s], territor[ies], or possession[s] of the United
States," 18 U. S. C. §48(c)(2)—extend well beyond hunting.
State agricultural regulations permit different methods of
livestock slaughter in different places or as applied to differ-
ent animals.  Compare, *e.g.,* Fla. Stat. §828.23(5) (2007)
(excluding poultry from humane slaughter requirements)

with Cal. Food & Agric. Code Ann. §19501(b) (West 2001) (including some poultry). California has recently banned cutting or "docking" the tails of dairy cattle, which other States permit. 2009 Cal. Legis. Serv. Ch. 344 (S. B. 135) (West). Even cockfighting, long considered immoral in much of America, see *Barnes* v. *Glen Theatre, Inc.*, 501 U. S. 560, 575 (1991) (SCALIA, J., concurring in judgment), is legal in Puerto Rico, see 15 Laws P. R. Ann. §301 (Supp. 2008); *Posadas de Puerto Rico Associates* v. *Tourism Co. of P. R.*, 478 U. S. 328, 342 (1986), and was legal in Louisiana until 2008, see La. Stat. Ann. §14:102.23 (West) (effective Aug. 15, 2008). An otherwise-lawful image of any of these practices, if sold or possessed for commercial gain within a State that happens to forbid the practice, falls within the prohibition of §48(a).

## C

The only thing standing between defendants who sell such depictions and five years in federal prison—other than the mercy of a prosecutor—is the statute's exceptions clause. Subsection (b) exempts from prohibition "any depiction that has serious religious, political, scientific, educational, journalistic, historical, or artistic value." The Government argues that this clause substantially narrows the statute's reach: News reports about animal cruelty have "journalistic" value; pictures of bullfights in Spain have "historical" value; and instructional hunting videos have "educational" value. Reply Brief 6. Thus, the Government argues, §48 reaches only crush videos, depictions of animal fighting (other than Spanish bullfighting, see Brief for United States 47–48), and perhaps other depictions of "extreme acts of animal cruelty." *Id.,* at 41.

The Government's attempt to narrow the statutory ban, however, requires an unrealistically broad reading of the exceptions clause. As the Government reads the clause, any material with "redeeming societal value," *id.*, at 9, 16,

23, "'at least some minimal value,'" Reply Brief 6 (quoting
H. R. Rep., at 4), or anything more than "scant social
value," Reply Brief 11, is excluded under §48(b). But the
text says "serious" value, and "serious" should be taken
seriously. We decline the Government's invitation—
advanced for the first time in this Court—to regard as
"serious" anything that is not "scant." (Or, as the dissent
puts it, "'trifling.'" *Post*, at 6.) As the Government recog-
nized below, "serious" ordinarily means a good bit more.
The District Court's jury instructions required value that
is "significant and of great import," App. 132, and the
Government defended these instructions as properly
relying on "a commonly accepted meaning of the word
'serious,'" Brief for United States in No. 05–2497 (CA3), p.
50.

Quite apart from the requirement of "serious" value in
§48(b), the excepted speech must also fall within one of the
enumerated categories. Much speech does not. Most
hunting videos, for example, are not obviously instruc-
tional in nature, except in the sense that all life is a les-
son. According to Safari Club International and the Con-
gressional Sportsmen's Foundation, many popular videos
"have primarily entertainment value" and are designed to
"entertai[n] the viewer, marke[t] hunting equipment, or
increas[e] the hunting community." Brief for Safari Club
International et al. as *Amici Curiae* 12. The National
Rifle Association agrees that "much of the content of hunt-
ing media . . . is merely *recreational* in nature." NRA Brief
28. The Government offers no principled explanation why
these depictions of hunting or depictions of Spanish bull-
fights would be *inherently* valuable while those of Japa-
nese dogfights are not. The dissent contends that hunting
depictions must have serious value because hunting has
serious value, in a way that dogfights presumably do not.
*Post,* at 6–8. But §48(b) addresses the value of the *depic-
tions*, not of the underlying activity. There is simply no

adequate reading of the exceptions clause that results in the statute's banning only the depictions the Government would like to ban.

The Government explains that the language of §48(b) was largely drawn from our opinion in *Miller* v. *California*, 413 U. S. 15 (1973), which excepted from its definition of obscenity any material with "serious literary, artistic, political, or scientific value," *id.,* at 24. See Reply Brief 8, 9, and n. 5. According to the Government, this incorporation of the *Miller* standard into §48 is therefore surely enough to answer any First Amendment objection. Reply Brief 8–9.

In *Miller* we held that "serious" value shields depictions of sex from regulation as obscenity. 413 U. S., at 24–25. Limiting *Miller*'s exception to "serious" value ensured that "'[a] quotation from Voltaire in the flyleaf of a book [would] not constitutionally redeem an otherwise obscene publication.'" *Id.,* at 25, n. 7 (quoting *Kois* v. *Wisconsin*, 408 U. S. 229, 231 (1972) (*per curiam*)). We did not, however, determine that serious value could be used as a general precondition to protecting *other* types of speech in the first place. *Most* of what we say to one another lacks "religious, political, scientific, educational, journalistic, historical, or artistic value" (let alone serious value), but it is still sheltered from government regulation. Even "'[w]holly neutral futilities . . . come under the protection of free speech as fully as do Keats' poems or Donne's sermons.'" *Cohen* v. *California*, 403 U. S. 15, 25 (1971) (quoting *Winters* v. *New York*, 333 U. S. 507, 528 (1948) (Frankfurter, J., dissenting); alteration in original).

Thus, the protection of the First Amendment presumptively extends to many forms of speech that do not qualify for the serious-value exception of §48(b), but nonetheless fall within the broad reach of §48(c).

### D

Not to worry, the Government says: The Executive Branch construes §48 to reach only "extreme" cruelty, Brief for United States 8, and it "neither has brought nor will bring a prosecution for anything less," Reply Brief 6– 7. The Government hits this theme hard, invoking its prosecutorial discretion several times. See *id.,* at 6–7, 10, and n. 6, 19, 22. But the First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige.* We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly. Cf. *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 473 (2001).

This prosecution is itself evidence of the danger in putting faith in government representations of prosecutorial restraint. When this legislation was enacted, the Executive Branch announced that it would interpret §48 as covering only depictions "of wanton cruelty to animals designed to appeal to a prurient interest in sex." See Statement by President William J. Clinton upon Signing H. R. 1887, 34 Weekly Comp. Pres. Doc. 2557 (Dec. 9, 1999). No one suggests that the videos in this case fit that description. The Government's assurance that it will apply §48 far more restrictively than its language provides is pertinent only as an implicit acknowledgment of the potential constitutional problems with a more natural reading.

Nor can we rely upon the canon of construction that "ambiguous statutory language [should] be construed to avoid serious constitutional doubts." *FCC* v. *Fox Television Stations, Inc.*, 556 U. S. \_\_\_, \_\_\_ (2009) (slip op., at 12). "[T]his Court may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction." *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 884 (1997). We "'will not rewrite a . . . law to conform it to constitutional requirements,'" *id.,* at 884–885 (quot-

ing *Virginia* v. *American Booksellers Assn., Inc.*, 484 U. S. 383, 397 (1988); omission in original), for doing so would constitute a "serious invasion of the legislative domain," *United States* v. *Treasury Employees*, 513 U. S. 454, 479, n. 26 (1995), and sharply diminish Congress's "incentive to draft a narrowly tailored law in the first place," *Osborne,* 495 U. S., at 121. To read §48 as the Government desires requires rewriting, not just reinterpretation.

\*    \*    \*

Our construction of §48 decides the constitutional question; the Government makes no effort to defend the constitutionality of §48 as applied beyond crush videos and depictions of animal fighting. It argues that those particular depictions are intrinsically related to criminal conduct or are analogous to obscenity (if not themselves obscene), and that the ban on such speech is narrowly tailored to reinforce restrictions on the underlying conduct, prevent additional crime arising from the depictions, or safeguard public mores. But the Government nowhere attempts to extend these arguments to depictions of any other activities—depictions that are presumptively protected by the First Amendment but that remain subject to the criminal sanctions of §48.

Nor does the Government seriously contest that the presumptively impermissible applications of §48 (properly construed) far outnumber any permissible ones. However "growing" and "lucrative" the markets for crush videos and dogfighting depictions might be, see Brief for United States 43, 46 (internal quotation marks omitted), they are dwarfed by the market for other depictions, such as hunting magazines and videos, that we have determined to be within the scope of §48. See *supra*, at 13–14. We therefore need not and do not decide whether a statute limited to crush videos or other depictions of extreme animal cruelty would be constitutional. We hold only that §48 is

not so limited but is instead substantially overbroad, and therefore invalid under the First Amendment.

   The judgment of the United States Court of Appeals for the Third Circuit is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

―――――――

No. 08–769

―――――――

## UNITED STATES, PETITIONER *v.* ROBERT J. STEVENS

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[April 20, 2010]

JUSTICE ALITO, dissenting.

The Court strikes down in its entirety a valuable statute, 18 U. S. C. §48, that was enacted not to suppress speech, but to prevent horrific acts of animal cruelty—in particular, the creation and commercial exploitation of "crush videos," a form of depraved entertainment that has no social value.  The Court's approach, which has the practical effect of legalizing the sale of such videos and is thus likely to spur a resumption of their production, is unwarranted.  Respondent was convicted under §48 for selling videos depicting dogfights.  On appeal, he argued, among other things, that §48 is unconstitutional as applied to the facts of this case, and he highlighted features of those videos that might distinguish them from other dogfight videos brought to our attention.[1]  The Court of

―――――――

[1] Respondent argued at length that the evidence was insufficient to prove that the particular videos he sold lacked any serious scientific, educational, or historical value and thus fell outside the exception in §48(b).  See Brief for Appellant in No. 05–2497 (CA3), pp. 72–79.  He added that, if the evidence in this case was held to be sufficient to take his videos outside the scope of the exception, then "this case presents . . . a situation" in which "a constitutional violation occurs." *Id.*, at 71.  See also *id.*, at 47 ("The applicability of 18 U. S. C. §48 to speech which is not a crush video or an appeal to some prurient sexual interest constitutes a restriction of protected speech, and an unwarranted violation of the First Amendment's free speech guarantee"); Brief for

Appeals—incorrectly, in my view—declined to decide whether §48 is unconstitutional as applied to respondent's videos and instead reached out to hold that the statute is facially invalid. Today's decision does not endorse the Court of Appeals' reasoning, but it nevertheless strikes down §48 using what has been aptly termed the "strong medicine" of the overbreadth doctrine, *United States* v. *Williams*, 553 U. S. 285, 293 (2008) (internal quotation marks omitted), a potion that generally should be administered only as "a last resort." *Los Angeles Police Dept.* v. *United Reporting Publishing Corp.*, 528 U. S. 32, 39 (1999) (internal quotation marks omitted).

Instead of applying the doctrine of overbreadth, I would vacate the decision below and instruct the Court of Appeals on remand to decide whether the videos that respondent sold are constitutionally protected. If the question of overbreadth is to be decided, however, I do not think the present record supports the Court's conclusion that §48 bans a substantial quantity of protected speech.

I

A party seeking to challenge the constitutionality of a statute generally must show that the statute violates the party's own rights. *New York* v. *Ferber*, 458 U. S. 747, 767 (1982). The First Amendment overbreadth doctrine carves out a narrow exception to that general rule. See *id.*, at 768; *Broadrick* v. *Oklahoma*, 413 U. S. 601, 611–612 (1973). Because an overly broad law may deter constitutionally protected speech, the overbreadth doctrine allows

_____

Respondent 55 ("Stevens' speech does not fit within any existing category of unprotected, prosecutable speech"); *id.*, at 57 ("[T]he record as a whole demonstrates that Stevens' speech cannot constitutionally be punished"). Contrary to the Court, *ante,* at 10–11, n. 3 (citing 533 F. 3d 218, 231, n. 13 (CA3 2008) (en banc)), I see no suggestion in the opinion of the Court of Appeals that respondent did not preserve an as-applied challenge.

a party to whom the law may constitutionally be applied to challenge the statute on the ground that it violates the First Amendment rights of others. See, *e.g.*, *Board of Trustees of State Univ. of N. Y.* v. *Fox*, 492 U. S. 469, 483 (1989) ("Ordinarily, the principal advantage of the over-breadth doctrine for a litigant is that it enables him to benefit from the statute's unlawful application *to someone else*"); see also *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 462, n. 20 (1978) (describing the doctrine as one "under which a person may challenge a statute that infringes protected speech even if the statute constitutionally might be applied to him").

The "strong medicine" of overbreadth invalidation need not and generally should not be administered when the statute under attack is unconstitutional as applied to the challenger before the court. As we said in *Fox, supra,* at 484–485, "[i]t is not the usual judicial practice, . . . nor do we consider it generally desirable, to proceed to an over-breadth issue unnecessarily—that is, before it is determined that the statute would be valid as applied." Accord, *New York State Club Assn., Inc.* v. *City of New York*, 487 U. S. 1, 11 (1988); see also *Broadrick, supra,* at 613; *United Reporting Publishing Corp.*, *supra*, at 45 (STEVENS, J., dissenting).

I see no reason to depart here from the generally preferred procedure of considering the question of over-breadth only as a last resort.[2] Because the Court has addressed the overbreadth question, however, I will explain why I do not think that the record supports the conclusion that §48, when properly interpreted, is overly broad.

---

[2] For the reasons set forth below, this is not a case in which the challenged statute is unconstitutional in all or almost all of its applications.

II

The overbreadth doctrine "strike[s] a balance between competing social costs." *Williams*, 553 U. S., at 292. Specifically, the doctrine seeks to balance the "harmful effects" of "invalidating a law that in some of its applications is perfectly constitutional" against the possibility that "the threat of enforcement of an overbroad law [will] dete[r] people from engaging in constitutionally protected speech." *Ibid.* "In order to maintain an appropriate balance, we have vigorously enforced the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Ibid.*

In determining whether a statute's overbreadth is substantial, we consider a statute's application to real-world conduct, not fanciful hypotheticals. See, *e.g.*, *id.*, at 301–302; see also *Ferber*, *supra*, at 773; *Houston* v. *Hill*, 482 U. S. 451, 466–467 (1987). Accordingly, we have repeatedly emphasized that an overbreadth claimant bears the burden of demonstrating, "from the text of [the law] *and from actual fact*," that substantial overbreadth exists. *Virginia* v. *Hicks*, 539 U. S. 113, 122 (2003) (quoting *New York State Club Assn.*, *supra*, at 14; emphasis added; internal quotation marks omitted; alteration in original). Similarly, "there must be a *realistic danger* that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 801 (1984) (emphasis added).

III

In holding that §48 violates the overbreadth rule, the Court declines to decide whether, as the Government maintains, §48 is constitutional as applied to two broad categories of depictions that exist in the real world: crush

videos and depictions of deadly animal fights. See *ante*, at 10, 19. Instead, the Court tacitly assumes for the sake of argument that §48 is valid as applied to these depictions, but the Court concludes that §48 reaches too much protected speech to survive. The Court relies primarily on depictions of hunters killing or wounding game and depictions of animals being slaughtered for food. I address the Court's examples below.

A

I turn first to depictions of hunting. As the Court notes, photographs and videos of hunters shooting game are common. See *ante,* at 13–14. But hunting is legal in all 50 States, and §48 applies only to a depiction of conduct that is illegal in the jurisdiction in which the depiction is created, sold, or possessed. §§48(a), (c). Therefore, in all 50 States, the creation, sale, or possession for sale of the vast majority of hunting depictions indisputably falls outside §48's reach.

Straining to find overbreadth, the Court suggests that §48 prohibits the sale or possession in the District of Columbia of any depiction of hunting because the District—undoubtedly because of its urban character—does not permit hunting within its boundaries. *Ante*, at 13. The Court also suggests that, because some States prohibit a particular type of hunting (*e.g.,* hunting with a crossbow or "canned" hunting) or the hunting of a particular animal (*e.g.*, the "sharp-tailed grouse"), §48 makes it illegal for persons in such States to sell or possess for sale a depiction of hunting that was perfectly legal in the State in which the hunting took place. See *ante,* at 12–14.

The Court's interpretation is seriously flawed. "When a federal court is dealing with a federal statute challenged as overbroad, it should, of course, construe the statute to avoid constitutional problems, if the statute is subject to such a limiting construction." *Ferber*, 458 U. S., at 769,

n. 24.   See also *Williams*, *supra,* at 307 (STEVENS, J., concurring) ("[T]o the extent the statutory text alone is unclear, our duty to avoid constitutional objections makes it especially appropriate to look beyond the text in order to ascertain the intent of its drafters").

Applying this canon, I would hold that §48 does not apply to depictions of hunting.  First, because §48 targets depictions of "animal cruelty," I would interpret that term to apply only to depictions involving acts of animal cruelty as defined by applicable state or federal law, not to depictions of acts that happen to be illegal for reasons having nothing to do with the prevention of animal cruelty.  See *ante*, at 12–13 (interpreting "[t]he text of §48(c)" to ban a depiction of "the humane slaughter of a stolen cow").  Virtually all state laws prohibiting animal cruelty either expressly define the term "animal" to exclude wildlife or else specifically exempt lawful hunting activities,[3] so the statutory prohibition set forth in §48(a) may reasonably be interpreted not to reach most if not all hunting depictions.

Second, even if the hunting of wild animals were otherwise covered by §48(a), I would hold that hunting depictions fall within the exception in §48(b) for depictions that have "serious" (*i.e.,* not "trifling"[4]) "scientific," "educa-

_____

[3] See Appendix, *infra* (citing statutes); B. Wagman, S. Waisman, & P. Frasch, Animal Law: Cases and Materials 92 (4th ed. 2010) ("Most anti-cruelty laws also include one or more exemptions," which often "exclud[e] from coverage (1) whole classes of animals, such as wildlife or farm animals, or (2) specific activities, such as hunting"); Note, Economics and Ethics in the Genetic Engineering of Animals, 19 Harv. J. L. & Tech. 413, 432 (2006) ("Not surprisingly, state laws relating to the humane treatment of wildlife, including deer, elk, and waterfowl, are virtually non-existent").

[4] Webster's Third New International Dictionary 2073 (1976); Random House Dictionary of the English Language 1303 (1966).  While the term "serious" may also mean "weighty" or "important," *ibid.*, we should adopt the former definition if necessary to avoid unconstitutionality.

tional," or "historical" value. While there are certainly those who find hunting objectionable, the predominant view in this country has long been that hunting serves many important values, and it is clear that Congress shares that view. Since 1972, when Congress called upon the President to designate a National Hunting and Fishing Day, see S. J. Res. 117, 92d Cong., 2d Sess. (1972), 86 Stat. 133, Presidents have regularly issued proclamations extolling the values served by hunting. See Presidential Proclamation No. 8421, 74 Fed. Reg. 49305 (Pres. Obama 2009) (hunting and fishing are "ageless pursuits" that promote "the conservation and restoration of numerous species and their natural habitats"); Presidential Proclamation No. 8295, 73 Fed. Reg. 57233 (Pres. Bush 2008) (hunters and anglers "add to our heritage and keep our wildlife populations healthy and strong," and "are among our foremost conservationists"); Presidential Proclamation No. 7822, 69 Fed. Reg. 59539 (Pres. Bush 2004) (hunting and fishing are "an important part of our Nation's heritage," and "America's hunters and anglers represent the great spirit of our country"); Presidential Proclamation No. 4682, 44 Fed. Reg. 53149 (Pres. Carter 1979) (hunting promotes conservation and an appreciation of "healthy recreation, peaceful solitude and closeness to nature"); Presidential Proclamation No. 4318, 39 Fed. Reg. 35315 (Pres. Ford 1974) (hunting furthers "appreciation and respect for nature" and preservation of the environment). Thus, it is widely thought that hunting has "scientific" value in that it promotes conservation, "historical" value in that it provides a link to past times when hunting played a critical role in daily life, and "educational" value in that it furthers the understanding and appreciation of nature and our country's past and instills valuable character traits. And if hunting itself is widely thought to serve these values, then it takes but a small additional step to conclude that depictions of hunting make a non-trivial

contribution to the exchange of ideas. Accordingly, I would hold that hunting depictions fall comfortably within the exception set out in §48(b).

I do not have the slightest doubt that Congress, in enacting §48, had no intention of restricting the creation, sale, or possession of depictions of hunting. Proponents of the law made this point clearly. See H. R. Rep. No. 106–397, p. 8 (1999) (hereinafter H. R. Rep.) ("[D]epictions of ordinary hunting and fishing activities do not fall within the scope of the statute"); 145 Cong. Rec. 25894 (Oct. 19, 1999) (Rep. McCollum) ("[T]he sale of depictions of legal activities, such as hunting and fishing, would not be illegal under this bill"); *id.*, at 25895 (Rep. Smith) ("[L]et us be clear as to what this legislation will not do. It will in no way prohibit hunting, fishing, or wildlife videos"). Indeed, even *opponents* acknowledged that §48 was not intended to reach ordinary hunting depictions. See *ibid.* (Rep. Scott); *id.*, at 25897 (Rep. Paul).

For these reasons, I am convinced that §48 has no application to depictions of hunting. But even if §48 did impermissibly reach the sale or possession of depictions of hunting in a few unusual situations (for example, the sale in Oregon of a depiction of hunting with a crossbow in Virginia or the sale in Washington State of the hunting of a sharp-tailed grouse in Idaho, see *ante*, at 14), those isolated applications would hardly show that §48 bans a substantial amount of protected speech.

B

Although the Court's overbreadth analysis rests primarily on the proposition that §48 substantially restricts the sale and possession of hunting depictions, the Court cites a few additional examples, including depictions of methods of slaughter and the docking of the tails of dairy cows. See *ante*, at 14–15.

Such examples do not show that the statute is substan-

tially overbroad, for two reasons. First, as explained above, §48 can reasonably be construed to apply only to depictions involving acts of animal cruelty as defined by applicable state or federal law, and anti-cruelty laws do not ban the sorts of acts depicted in the Court's hypotheticals. See, *e.g.*, Idaho Code §25–3514 (Lexis 2000) ("No part of this chapter [prohibiting cruelty to animals] shall be construed as interfering with or allowing interference with . . . [t]he humane slaughter of any animal normally and commonly raised as food or for production of fiber . . . [or] [n]ormal or accepted practices of . . . animal husbandry"); Kan. Stat. Ann. § 21–4310(b) (2007) ("The provisions of this section shall not apply to . . . with respect to farm animals, normal or accepted practices of animal husbandry, including the normal and accepted practices for the slaughter of such animals"); Md. Crim. Law Code Ann. §10–603 (Lexis 2002) (sections prohibiting animal cruelty "do not apply to . . . customary and normal veterinary and agricultural husbandry practices, including dehorning, castration, tail docking, and limit feeding").

Second, nothing in the record suggests that any one has ever created, sold, or possessed for sale a depiction of the slaughter of food animals or of the docking of the tails of dairy cows that would not easily qualify under the exception set out in §48(b). Depictions created to show proper methods of slaughter or tail-docking would presumably have serious "educational" value, and depictions created to focus attention on methods thought to be inhumane or otherwise objectionable would presumably have either serious "educational" or "journalistic" value or both. In short, the Court's examples of depictions involving the docking of tails and humane slaughter do not show that §48 suffers from any overbreadth, much less substantial overbreadth.

The Court notes, finally, that cockfighting, which is illegal in all States, is still legal in Puerto Rico, *ante*, at 15,

and I take the Court's point to be that it would be impermissible to ban the creation, sale, or possession in Puerto Rico of a depiction of a cockfight that was legally staged in Puerto Rico.[5]  But assuming for the sake of argument that this is correct, this veritable sliver of unconstitutionality would not be enough to justify striking down §48 *in toto.*

In sum, we have a duty to interpret §48 so as to avoid serious constitutional concerns, and §48 may reasonably be construed not to reach almost all, if not all, of the depictions that the Court finds constitutionally protected. Thus, §48 does not appear to have a large number of unconstitutional applications.  Invalidation for overbreadth is appropriate only if the challenged statute suffers from *substantial* overbreadth—judged not just in absolute terms, but in relation to the statute's "plainly legitimate sweep." *Williams*, 553 U. S., at 292.  As I explain in the following Part, §48 has a substantial core of constitutionally permissible applications.

## IV
### A
#### 1

As the Court of Appeals recognized, "the primary conduct that Congress sought to address through its passage [of §48] was the creation, sale, or possession of 'crush videos.'"  533 F. 3d 218, 222 (CA3 2008) (en banc).  A sample crush video, which has been lodged with the Clerk, records the following event:

---

[5] Since the Court has taken pains not to decide whether §48 would be unconstitutional as applied to graphic dogfight videos, including those depicting fights occurring in countries where dogfighting is legal, I take it that the Court does not intend for its passing reference to cockfights to mean either that all depictions of cockfights, whether legal or illegal under local law, are protected by the First Amendment or that it is impermissible to ban the sale or possession in the States of a depiction of a legal cockfight in Puerto Rico.

> "[A] kitten, secured to the ground, watches and shrieks in pain as a woman thrusts her high-heeled shoe into its body, slams her heel into the kitten's eye socket and mouth loudly fracturing its skull, and stomps repeatedly on the animal's head. The kitten hemorrhages blood, screams blindly in pain, and is ultimately left dead in a moist pile of blood-soaked hair and bone." Brief for Humane Society of United States as *Amicus Curiae* 2 (hereinafter Humane Society Brief).

It is undisputed that the *conduct* depicted in crush videos may constitutionally be prohibited. All 50 States and the District of Columbia have enacted statutes prohibiting animal cruelty. See 533 F. 3d, at 223, and n. 4 (citing statutes); H. R. Rep., at 3. But before the enactment of §48, the underlying conduct depicted in crush videos was nearly impossible to prosecute. These videos, which "often appeal to persons with a very specific sexual fetish," *id.*, at 2, were made in secret, generally without a live audience, and "the faces of the women inflicting the torture in the material often were not shown, nor could the location of the place where the cruelty was being inflicted or the date of the activity be ascertained from the depiction." *Id.*, at 3. Thus, law enforcement authorities often were not able to identify the parties responsible for the torture. See Punishing Depictions of Animal Cruelty and the Federal Prisoner Health Care Co-Payment Act of 1999: Hearing before the Subcommittee on Crime of the House Committee on the Judiciary, 106th Cong., 1st Sess., p. 1 (1999) (hereinafter Hearing on Depictions of Animal Cruelty). In the rare instances in which it was possible to identify and find the perpetrators, they "often were able to successfully assert as a defense that the State could not prove its jurisdiction over the place where the act occurred or that the actions depicted took place within the time specified in

the State statute of limitations." H. R. Rep., at 3*; see also* 145 Cong. Rec. 25896 (Rep. Gallegly) ("[I]t is the prosecutors from around this country, Federal prosecutors as well as State prosecutors, that have made an appeal to us for this"); Hearing on Depictions of Animal Cruelty 21 ("If the production of the video is not discovered during the actual filming, then prosecution for the offense is virtually impossible without a cooperative eyewitness to the filming or an undercover police operation"); *id.*, at 34–35 (discussing example of case in which state prosecutor "had the defendant telling us he produced these videos," but where prosecution was not possible because the State could not prove where or when the tape was made).

In light of the practical problems thwarting the prosecution of the creators of crush videos under state animal cruelty laws, Congress concluded that the only effective way of stopping the underlying criminal conduct was to prohibit the commercial exploitation of the videos of that conduct. And Congress' strategy appears to have been vindicated. We are told that "[b]y 2007, sponsors of §48 declared the crush video industry dead. Even overseas Websites shut down in the wake of §48. Now, after the Third Circuit's decision [facially invalidating the statute], crush videos are already back online." Humane Society Brief 5 (citations omitted).

2

The First Amendment protects freedom of speech, but it most certainly does not protect violent criminal conduct, even if engaged in for expressive purposes. Crush videos present a highly unusual free speech issue because they are so closely linked with violent criminal conduct. The videos record the commission of violent criminal acts, and it appears that these crimes are committed for the sole purpose of creating the videos. In addition, as noted above, Congress was presented with compelling evidence

that the only way of preventing these crimes was to target the sale of the videos. Under these circumstances, I cannot believe that the First Amendment commands Congress to step aside and allow the underlying crimes to continue.

The most relevant of our prior decisions is *Ferber*, 458 U. S. 747, which concerned child pornography. The Court there held that child pornography is not protected speech, and I believe that *Ferber*'s reasoning dictates a similar conclusion here.

In *Ferber,* an important factor—I would say the most important factor—was that child pornography involves the commission of a crime that inflicts severe personal injury to the "children who are made to engage in sexual conduct for commercial purposes.'" *Id.,* at 753 (internal quotation marks omitted). The *Ferber* Court repeatedly described the production of child pornography as child "abuse," "molestation," or "exploitation." See, *e.g.*, *id.*, at 749 ("In recent years, the exploitive use of children in the production of pornography has become a serious national problem"); *id.*, at 758, n. 9 ("Sexual molestation by adults is often involved in the production of child sexual performances"). As later noted in *Ashcroft* v. *Free Speech Coalition*, 535 U. S. 234, 249 (2002), in *Ferber* "[t]he production of the work, not its content, was the target of the statute." See also 535 U.S., at 250 (*Ferber* involved "speech that itself is the record of sexual abuse").

Second, *Ferber* emphasized the fact that these underlying crimes could not be effectively combated without targeting the distribution of child pornography. As the Court put it, "the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled." 458 U. S., at 759. The Court added:

"[T]here is no serious contention that the legislature

was unjustified in believing that it is difficult, if not impossible, to halt the exploitation of children by pursuing only those who produce the photographs and movies. . . . The most expeditious if not the only practical method of law enforcement may be to dry up the market for this material by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product." *Id.*, at 759–760.

See also *id.*, at 761 ("The advertising and selling of child pornography provide an economic motive for and are thus an integral part of the production of such materials").

Third, the *Ferber* Court noted that the value of child pornography "is exceedingly modest, if not *de minimis,"* and that any such value was "overwhelmingly out-weigh[ed]" by "the evil to be restricted." *Id.*, at 762–763.

All three of these characteristics are shared by §48, as applied to crush videos. First, the conduct depicted in crush videos is criminal in every State and the District of Columbia. Thus, any crush video made in this country records the actual commission of a criminal act that inflicts severe physical injury and excruciating pain and ultimately results in death. Those who record the underlying criminal acts are likely to be criminally culpable, either as aiders and abettors or conspirators. And in the tight and secretive market for these videos, some who sell the videos or possess them with the intent to make a profit may be similarly culpable. (For example, in some cases, crush videos were commissioned by purchasers who specified the details of the acts that they wanted to see performed. See H. R. Rep., at 3; Hearing on Depictions of Animal Cruelty 27). To the extent that §48 reaches such persons, it surely does not violate the First Amendment.

Second, the criminal acts shown in crush videos cannot be prevented without targeting the conduct prohibited by §48—the creation, sale, and possession for sale of depic-

tions of animal torture with the intention of realizing a commercial profit. The evidence presented to Congress posed a stark choice: Either ban the commercial exploitation of crush videos or tolerate a continuation of the criminal acts that they record. Faced with this evidence, Congress reasonably chose to target the lucrative crush video market.

Finally, the harm caused by the underlying crimes vastly outweighs any minimal value that the depictions might conceivably be thought to possess. Section 48 reaches only the actual recording of acts of animal torture; the statute does not apply to verbal descriptions or to simulations. And, unlike the child pornography statute in *Ferber* or its federal counterpart, 18 U. S. C. §2252, §48(b) provides an exception for depictions having any "serious religious, political, scientific, educational, journalistic, historical, or artistic value."

It must be acknowledged that §48 differs from a child pornography law in an important respect: preventing the abuse of children is certainly much more important than preventing the torture of the animals used in crush videos. It was largely for this reason that the Court of Appeals concluded that *Ferber* did not support the constitutionality of §48. 533 F. 3d, at 228 ("Preventing cruelty to animals, although an exceedingly worthy goal, simply does not implicate interests of the same magnitude as protecting children from physical and psychological harm"). But while protecting children is unquestionably *more* important than protecting animals, the Government also has a compelling interest in preventing the torture depicted in crush videos.

The animals used in crush videos are living creatures that experience excruciating pain. Our society has long banned such cruelty, which is illegal throughout the country. In *Ferber*, the Court noted that "virtually all of the States and the United States have passed legislation

proscribing the production of or otherwise combating 'child pornography,'" and the Court declined to "second-guess [that] legislative judgment."[6]   458 U. S., at 758.   Here, likewise, the Court of Appeals erred in second-guessing the legislative judgment about the importance of preventing cruelty to animals.

Section 48's ban on trafficking in crush videos also helps to enforce the criminal laws and to ensure that criminals do not profit from their crimes.  See 145 Cong. Rec. 25897 (Oct. 19, 1999) (Rep. Gallegly) ("The state has an interest in enforcing its existing laws.  Right now, the laws are not only being violated, but people are making huge profits from promoting the violations"); *id.,* at 10685 (May 24, 1999) (Rep. Gallegly) (explaining that he introduced the House version of the bill because "criminals should not profit from [their] illegal acts").  We have already judged that taking the profit out of crime is a compelling interest. See *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 119 (1991).

In short, *Ferber* is the case that sheds the most light on the constitutionality of Congress' effort to halt the production of crush videos.  Applying the principles set forth in *Ferber*, I would hold that crush videos are not protected by the First Amendment.

## B

Application of the *Ferber* framework also supports the

_____

[6] In other cases, we have regarded evidence of a national consensus as proof that a particular government interest is compelling.  See *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 118 (1991) (State's compelling interest "in ensuring that victims of crime are compensated by those who harm them" evidenced by fact that "[e]very State has a body of tort law serving exactly this interest"); *Roberts* v. *United States Jaycees*, 468 U. S. 609, 624–625 (1984) (citing state laws prohibiting discrimination in public accommodations as evidence of the compelling governmental interest in ensuring equal access).

constitutionality of §48 as applied to depictions of brutal animal fights. (For convenience, I will focus on videos of dogfights, which appear to be the most common type of animal fight videos.)

First, such depictions, like crush videos, record the actual commission of a crime involving deadly violence. Dogfights are illegal in every State and the District of Columbia, Brief for United States 26–27, and n. 8 (citing statutes), and under federal law constitute a felony punishable by imprisonment for up to five years, 7 U. S. C. §2156 *et seq.* (2006 ed. and Supp. II), 18 U. S. C. §49 (2006 ed., Supp. II).

Second, Congress had an ample basis for concluding that the crimes depicted in these videos cannot be effectively controlled without targeting the videos. Like crush videos and child pornography, dogfight videos are very often produced as part of a "low-profile, clandestine industry," and "the need to market the resulting products requires a visible apparatus of distribution." *Ferber,* 458 U. S., at 760. In such circumstances, Congress had reasonable grounds for concluding that it would be "difficult, if not impossible, to halt" the underlying exploitation of dogs by pursuing only those who stage the fights. *Id.,* at 759–760; see 533 F. 3d, at 246 (Cowen, J., dissenting) (citing evidence establishing "the existence of a lucrative market for depictions of animal cruelty," including videos of dogfights, "which in turn provides a powerful incentive to individuals to create [such] videos").

The commercial trade in videos of dogfights is "an integral part of the production of such materials," *Ferber, supra,* at 761. As the Humane Society explains, "[v]ideotapes memorializing dogfights are integral to the success of this criminal industry" for a variety of reasons. Humane Society Brief 5. For one thing, some dogfighting videos are made "solely for the purpose of selling the video (and not for a live audience)." *Id.,* at 9. In addition, those

who stage dogfights profit not just from the sale of the videos themselves, but from the gambling revenue they take in from the fights; the videos "encourage [such] gambling activity because they allow those reluctant to attend actual fights for fear of prosecution to still bet on the outcome." *Ibid.;* accord, Brief for Center on the Administration of Criminal Law as *Amicus Curiae* 12 ("Selling videos of dogfights effectively abets the underlying crimes by providing a market for dogfighting while allowing actual dogfights to remain underground"); *ibid.* ("These videos are part of a 'lucrative market' where videos are produced by a 'bare-boned, clandestine staff' in order to permit the actual location of dogfights and the perpetrators of these underlying criminal activities to go undetected" (citations omitted)). Moreover, "[v]ideo documentation is vital to the criminal enterprise because it provides *proof* of a dog's fighting prowess—proof demanded by potential buyers and critical to the underground market." Humane Society Brief 9. Such recordings may also serve as "'training' videos for other fight organizers." *Ibid.* In short, because videos depicting live dogfights are essential to the success of the criminal dogfighting subculture, the commercial sale of such videos helps to fuel the market for, and thus to perpetuate the perpetration of, the criminal conduct depicted in them.

Third, depictions of dogfights that fall within §48's reach have by definition no appreciable social value. As noted, §48(b) exempts depictions having any appreciable social value, and thus the mere inclusion of a depiction of a live fight in a larger work that aims at communicating an idea or a message with a modicum of social value would not run afoul of the statute.

Finally, the harm caused by the underlying criminal acts greatly outweighs any trifling value that the depictions might be thought to possess. As the Humane Society explains:

"The abused dogs used in fights endure physical torture and emotional manipulation throughout their lives to predispose them to violence; common tactics include feeding the animals hot peppers and gunpowder, prodding them with sticks, and electrocution. Dogs are conditioned never to give up a fight, even if they will be gravely hurt or killed. As a result, dogfights inflict horrific injuries on the participating animals, including lacerations, ripped ears, puncture wounds and broken bones. Losing dogs are routinely refused treatment, beaten further as 'punishment' for the loss, and executed by drowning, hanging, or incineration." *Id.,* at 5–6 (footnotes omitted).

For these dogs, unlike the animals killed in crush videos, the suffering lasts for years rather than minutes. As with crush videos, moreover, the statutory ban on commerce in dogfighting videos is also supported by compelling governmental interests in effectively enforcing the Nation's criminal laws and preventing criminals from profiting from their illegal activities. See *Ferber*, *supra*, at 757–758; *Simon & Schuster*, 502 U. S., at 119.

In sum, §48 may validly be applied to at least two broad real-world categories of expression covered by the statute: crush videos and dogfighting videos. Thus, the statute has a substantial core of constitutionally permissible applications. Moreover, for the reasons set forth above, the record does not show that §48, properly interpreted, bans a substantial amount of protected speech in absolute terms. *A fortiori*, respondent has not met his burden of demonstrating that any impermissible applications of the statute are "substantial" in relation to its "plainly legitimate sweep." *Williams*, 553 U. S., at 292. Accordingly, I would reject respondent's claim that §48 is facially unconstitutional under the overbreadth doctrine.

ALITO, J., dissenting

\*          \*          \*

For these reasons, I respectfully dissent.

## APPENDIX

As the following chart makes clear, virtually all state laws prohibiting animal cruelty either expressly define the term "animal" to exclude wildlife or else specifically exempt lawful hunting activities.

| Alaska | Alaska Stat. §11.61.140(c)(4) (2008) ("It is a defense to a prosecution under this section that the conduct of the defendant . . . was necessarily incidental to lawful fishing, hunting or trapping activities") |
|---|---|
| Arizona | Ariz. Rev. Stat. Ann. §§13–2910(C)(1), (3) (West Supp. 2009) ("This section does not prohibit or restrict . . . [t]he taking of wildlife or other activities permitted by or pursuant to title 17 . . . [or] [a]ctivities regulated by the Arizona game and fish department or the Arizona department of agriculture") |
| Arkansas | Ark. Code Ann. §5–62–105(a) (Supp. 2009) ("This subchapter does not prohibit any of the following activities: . . . (9) Engaging in the taking of game or fish through hunting, trapping, or fishing, or engaging in any other activity authorized by Arkansas Constitution, Amendment 35, by §15–41–101 et seq., or by any Arkansas State Game and Fish Commission regulation promulgated under either Arkansas Constitution, Amendment 35, or statute") |
| California | Cal. Penal Code Ann. §599c (West 1999) ("No part of this title shall be construed as interfering with any of the laws of this state known as the 'game laws,' . . . or to interfere with the right to kill all animals used for food") |
| Colorado | Colo. Rev. Stat. Ann. §18–9–201.5(2) (2009) ("In case of any conflict between this part 2 [prohibiting cruelty to animals] or section 35–43–126, [Colo. Rev. Stat.], and the wildlife statutes of |

| | |
|---|---|
| | the state, said wildlife statutes shall control"), §18–9–202(3) ("Nothing in this part 2 shall be construed to amend or in any manner change the authority of the wildlife commission, as established in title 33, [Colo. Rev. Stat.], or to prohibit any conduct therein authorized or permitted") |
| Connecticut | Conn. Gen. Stat. §53–247(b) (2009) ("Any person who maliciously and intentionally maims, mutilates, tortures, wounds or kills an animal shall be fined not more than five thousand dollars or imprisoned not more than five years or both. The provisions of this subsection shall not apply to . . . any person . . . while lawfully engaged in the taking of wildlife") |
| Delaware | Del. Code Ann., Tit. 11, §1325(f) (2007) ("This section shall not apply to the lawful hunting or trapping of animals as provided by law") |
| Florida | Fla. Stat. §828.122(9)(b) (2007) ("This section shall not apply to . . . [a]ny person using animals to pursue or take wildlife or to participate in any hunting regulated or subject to being regulated by the rules and regulations of the Fish and Wildlife Conservation Commission") |
| Georgia | Ga. Code Ann. §16–12–4(e) (2007) ("The provisions of this Code section shall not be construed as prohibiting conduct which is otherwise permitted under the laws of this state or of the United States, including, but not limited to . . . hunting, trapping, fishing, [or] wildlife management") |
| Hawaii | Haw. Rev. Stat. §711–1108.5(1) (2008 Cum. Supp.) ("A person commits the offense of cruelty to animals in the first degree if the person intentionally or knowingly tortures, mutilates, or poisons or causes the torture, mutilation, or poisoning of any pet animal or equine animal resulting in serious bodily injury or death of the pet animal or equine animal") |

Appendix to opinion of ALITO, J.

| Idaho | Idaho Code §25–3515 (Lexis 2000) ("No part of this chapter shall be construed as interfering with, negating or preempting any of the laws or rules of the department of fish and game of this state . . . or to interfere with the right to kill, slaughter, bag or take all animals used for food") |
|-------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Illinois | Ill. Comp. Stat., ch. 510, §70/13 (West 2006) ("In case of any alleged conflict between this Act . . . and the 'Wildlife Code of Illinois' or 'An Act to define and require the use of humane methods in the handling, preparation for slaughter, and slaughter of livestock for meat or meat products to be offered for sale', . . . the provisions of those Acts shall prevail"), §70/3.03(b)(1) ("For the purposes of this Section, 'animal torture' does not include any death, harm, or injury caused to any animal by . . . any hunting, fishing, trapping, or other activity allowed under the Wildlife Code, the Wildlife Habitat Management Areas Act, or the Fish and Aquatic Life Code" (footnotes omitted)) |
| Indiana | Ind. Code §35–46–3–5(a) (West 2004) (subject to certain exceptions not relevant here, "this chapter [prohibiting "Offenses Relating to Animals"] does not apply to . . . [f]ishing, hunting, trapping, or other conduct authorized under [Ind. Code §]14–22") |
| Iowa | Iowa Code §717B.2(5) (2009) ("This section [banning "animal abuse"] shall not apply to . . . [a] person taking, hunting, trapping, or fishing for a wild animal as provided in chapter 481A"), §717B.3A(2)(e) ("This section [banning "animal torture"] shall not apply to . . . [a] person taking, hunting, trapping, or fishing for a wild animal as provided in chapter 481A") |
| Kansas | Kan. Stat. Ann. §21–4310(b)(3) (2007) ("The provisions of this section shall not apply to . . . killing, attempting to kill, trapping, catching or taking of any animal in accordance with the |

| | |
|---|---|
| | provisions of chapter 32 [Wildlife, Parks and Recreation] or chapter 47 [Livestock and Domestic Animals] of the Kansas Statutes Annotated") |
| Kentucky | Ky. Rev. Stat. Ann. §§525.130(2)(a), (e) (Lexis 2008) ("Nothing in this section shall apply to the killing of animals . . . [p]ursuant to a license to hunt, fish, or trap . . . [or] [f]or purposes relating to sporting activities"), §525.130(3) ("Activities of animals engaged in hunting, field trials, dog training other than training a dog to fight for pleasure or profit, and other activities authorized either by a hunting license or by the Department of Fish and Wildlife shall not constitute a violation of this section") |
| Louisiana | La. Rev. Stat. Ann. §14:102.1(C)(1) (West Supp. 2010) ("This Section shall not apply to . . . [t]he lawful hunting or trapping of wildlife as provided by law") |
| Maine | Me. Rev. Stat. Ann., Tit. 17, §1031(1)(G) (West Supp. 2009) (providing that hunting and trapping an animal is not a form of prohibited animal cruelty if "permitted pursuant to" parts of state code regulating the shooting of large game, inland fisheries, and wildlife) |
| Maryland | Md. Crim. Law Code Ann. §10–603(3) (Lexis 2002) ("Sections 10–601 through 10–608 of this subtitle do not apply to . . . an activity that may cause unavoidable physical pain to an animal, including . . . hunting, if the person performing the activity uses the most humane method reasonably available") |
| Michigan | Mich. Comp. Laws Ann. §§750.50(11)(a), (b) (West Supp. 2009) ("This section does not prohibit the lawful killing or other use of an animal, including . . . [f]ishing . . . [h]unting, [or] trapping [as regulated by state law]"), §750.50b(9)(a), (b) ("This section does not prohibit the lawful killing or other use of an ani- |

Appendix to opinion of ALITO, J.

| | |
|---|---|
| | mal, including . . . [f]ishing . . . [h]unting, [or] trapping [as regulated by state law]") |
| Missouri | Mo. Rev. Stat. §578.007(3) (2000) ("The provisions of sections 578.005 to 578.023 shall not apply to . . . [h]unting, fishing, or trapping as allowed by" state law) |
| Montana | Mont. Code Ann. §45–8–211(4)(d) (2009) ("This section does not prohibit . . . lawful fishing, hunting, and trapping activities") |
| Nebraska | Neb. Rev. Stat. §28–1013(4) (2008) (exempting "[c]ommonly accepted practices of hunting, fishing, or trapping") |
| Nevada | Nev. Rev. Stat. §§574.200(1), (3) (2007) (provisions of Nevada law banning animal cruelty "do not . . . [i]nterfere with any of the fish and game laws . . . [or] the right to kill all animals and fowl used for food") |
| New Hampshire | N. H. Rev. Stat. Ann. §644:8(II) (West Supp. 2009) ("In this section, 'animal' means a domestic animal, a household pet or a wild animal in captivity") |
| New Jersey | N. J. Stat. Ann. §4:22–16(c) (West 1998) ("Nothing contained in this article shall be construed to prohibit or interfere with . . . [t]he shooting or taking of game or game fish in such manner and at such times as is allowed or provided by the laws of this State") |
| New Mexico | N. M. Stat. Ann. §30–18–1(I)(1) (Supp. 2009) ("The provisions of this section do not apply to . . . fishing, hunting, falconry, taking and trapping") |
| New York | N. Y. Agric. & Mkts. Law Ann. §353–a(2) (West 2004) ("Nothing contained in this section shall be construed to prohibit or interfere in any way with anyone lawfully engaged in hunting, trapping, or fishing") |
| North Carolina | N. C. Gen. Stat. Ann. §14–360(c)(1) (Lexis 2009) ("[T]his section shall not apply to . . . [t]he lawful taking of animals under the jurisdiction |

| | |
|---|---|
| | and regulation of the Wildlife Resources Commission . . .") |
| North Dakota | N. D. Cent. Code Ann. §36–21.1–01(5)(a) (Lexis Supp. 2009) (" 'Cruelty' or 'torture' . . . does not include . . . [a]ny activity that requires a license or permit under chapter 20.1–03 [which governs gaming and other licenses]") |
| Oregon | Ore. Rev. Stat. §167.335 (2007) ("Unless gross negligence can be shown, the provisions of [certain statutes prohibiting animal cruelty] do not apply to . . . (7) [l]awful fishing, hunting and trapping activities") |
| Pennsylvania | 18 Pa. Cons. Stat. §5511(a)(3)(ii) (2008) ("This subsection [banning killing, maiming, or poisoning of domestic animals or zoo animals] shall not apply to . . . the killing of any animal or fowl pursuant to . . . The Game Law"), §5511(c)(1) ("A person commits an offense if he wantonly or cruelly illtreats, overloads, beats, otherwise abuses any animal, or neglects any animal as to which he has a duty of care") |
| Rhode Island | R. I. Gen. Laws §4–1–3(a) (Lexis 1998) (prohibiting "[e]very owner, possessor, or person having the charge or custody of any animal" from engaging in certain acts of unnecessary cruelty), §§4–1–5(a), (b) (prohibiting only "[m]alicious" injury to or killing of animals and further providing that "[t]his section shall not apply to licensed hunters during hunting season or a licensed business killing animals for human consumption") |
| South Carolina | S. C. Code Ann. §47–1–40(C) (Supp. 2009) ("This section does not apply to . . . activity authorized by Title 50 [consisting of laws on Fish, Game, and Watercraft]") |
| South Dakota | S. D. Codified Laws §40–1–17 (2004) ("The acts and conduct of persons who are lawfully engaged in any of the activities authorized by Title 41 [Game, Fish, Parks and Forestry] . . . and |

Appendix to opinion of ALITO, J.

| | |
|---|---|
| | persons who properly kill any animal used for food and sport hunting, trapping, and fishing as authorized by the South Dakota Department of Game, Fish and Parks, are exempt from the provisions of this chapter") |
| Tennessee | Tenn. Code Ann. §39–14–201(1) (2010 Supp.) ("'Animal' means a domesticated living creature or a wild creature previously captured"), §39–14–201(4) ("[N]othing in this part shall be construed as prohibiting the shooting of birds or game for the purpose of human food or the use of animate targets by incorporated gun clubs") |
| Texas | Tex. Penal Code Ann. §42.092(a)(2) (West Supp. 2009) ("'Animal' means a domesticated living creature, including any stray or feral cat or dog, and a wild living creature previously captured. The term does not include an uncaptured wild living creature or a livestock animal"), §42.092(f)(1)(A) ("It is an exception to the application of this section that the conduct engaged in by the actor is a generally accepted and otherwise lawful . . . form of conduct occurring solely for the purpose of or in support of . . . fishing, hunting, or trapping") |
| Utah | Utah Code Ann. §76–9–301(1)(b)(ii)(D) (Lexis 2008) ("'Animal' does not include . . . wildlife, as defined in Section 23–13–2, including protected and unprotected wildlife, if the conduct toward the wildlife is in accordance with lawful hunting, fishing, or trapping practices or other lawful practices"), §76–9–301(9)(C) ("This section does not affect or prohibit . . . the lawful hunting of, fishing for, or trapping of, wildlife") |
| Vermont | Vt. Stat. Ann., Tit. 13, §351b(1) (2009) ("This subchapter shall not apply to . . . activities regulated by the department of fish and wildlife pursuant to Part 4 of Title 10") |
| Virginia | Va. Code Ann. §3.2–6570D (Lexis 2008) ("This section shall not prohibit authorized wildlife |

| | |
|---|---|
| | management activities or hunting, fishing or trapping [as regulated by state law]") |
| Washington | Wash. Rev. Code §16.52.180 (2008) ("No part of this chapter shall be deemed to interfere with any of the laws of this state known as the 'game laws' . . . or to interfere with the right to kill animals to be used for food") |
| West Virginia | W. Va. Code Ann. §61–8–19(f) (Lexis Supp. 2009) ("The provisions of this section do not apply to lawful acts of hunting, fishing, [or] trapping") |
| Wisconsin | Wis. Stat. §951.015(1) (2007–2008) ("This chapter may not be interpreted as controverting any law regulating wild animals that are subject to regulation under ch. 169 [regulating, among other things, hunting], [or] the taking of wild animals") |
| Wyoming | Wyo. Stat. Ann. §6–3–203(m)(iv) (2009) ("Nothing in subsection (a), (b) or (n) of this section shall be construed to prohibit . . . [t]he hunting, capture or destruction of any predatory animal or other wildlife in any manner not otherwise prohibited by law") |